## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| BARRY HONIG and GRQ CONSULTANTS, INC., <br><br> *Plaintiffs*, <br><br> v. <br><br> GREGORY D. COHEN, GREG COHEN PROMOTIONS LLC, and BULLDOG BOXING PROMOTIONS LLC, <br> *Defendants*. | Civil Action No. <br><br> **COMPLAINT** |

Plaintiffs Barry Honig ("Honig") and GRQ Consultants, Inc. ("GRQ") by and through their undersigned attorneys, file this Complaint against Gregory D. Cohen ("Cohen"), Greg Cohen Promotions, LLC ("GCP"), and Bulldog Boxing Promotions LLC ("BBP") hereby allege as follows:

## I.      NATURE OF THE ACTION

1.      This is an action for both breach of contract and fraud. Defendants, operators of a boxing business, consistently solicited Plaintiffs for monies to support that business. They employed a strategic approach to persuade Plaintiffs into financing new fighters and boxing endeavors. First, Defendants would claim to need financing for, among other things, advancing boxers' signing bonuses, training fees, sanctioning fees with the bodies that oversee boxing matches, travel fees for boxers, legal fees associated with the various agreements needed to document the promotional relationships, registration fees, visa fees, purses, and other alleged business-related purposes. Then Defendants would entice Plaintiffs to provide financing by making alluring assurances and commitments, which included claims of securing fighters to exclusive contracts, scheduling upcoming bouts, and large purse earnings for Plaintiffs.

653426-8

2.      Sometimes these assurances were based on real facts, but oftentimes they were not. In those instances, Cohen's pattern was to continue his deceptions for months, even when questioned by Honig. Ultimately, Honig confronted Cohen about these lies and Cohen did not dispute them. By the end of 2022, Cohen and his affiliated entities GCP and BBP had racked up a debt of over $2 million to Plaintiffs – a debt that Defendants have acknowledged on multiple occasions.

3.      Plaintiffs and Defendants entered into a series of agreements that documented the parties' financing relationship. The initial understanding between the parties was that Plaintiffs would loan monies to Cohen and his entities specifically to fund individual fighters. Under this understanding, Plaintiffs would receive their advanced expenses first, and then 50% of the revenues and/or profits received by Cohen and GCP. The economics changed after Cohen breached multiple agreements and failed to repay Plaintiffs moneys owed.

4.      On November 5, 2019, the parties executed a Standstill Agreement where Cohen acknowledged a then-outstanding debt of $1,026,000. This Standstill Agreement has been amended since 2019 on at least two occasions, resulting in Plaintiffs advancing additional monies to Defendants. These agreements required Defendants to repay their debt to Plaintiffs through the sharing of revenues from fights, but Defendants repeatedly failed to do so. To this day, Defendants continue to fail to share revenues from fights as promised.

5.      Since entering into the Standstill Agreement and its associated amendments, Plaintiffs have learned that Cohen has repeatedly lied to Honig when requesting loans to supposedly fund signing bonuses, advances for new fighters, training fees, visas, sanction fees, and special permit fees. In numerous instances, Defendants lacked any relationship with these boxers, and the fights that Plaintiffs were led to believe they were funding never occurred. What

2

is more, Plaintiffs understand that Defendants used at least some of the funds they advanced to make improper payments to World Boxing Association ("WBA") officials personally to induce them to rank certain fighters – that is to say, on bribes. Defendants' lies resulted in their misappropriation of $700,000 of Plaintiffs' money.

6.      In addition, Defendants agreed both orally and in writing to provide Plaintiffs with supporting documentation including contracts, memorandums, agreements, financial records, tax returns and all other material documents necessary to audit the operations of GCP, BBP, and Cohen individually. But Defendants have refused to provide the documents that Defendants were contractually obligated to produce, preventing Plaintiffs from knowing the full extent of Defendants' contractual breaches and fraud.

## II.      PARTIES

7.      Plaintiff Barry Honig is an individual who resides in Boca Raton, Florida.

8.      Plaintiff GRQ Consultants, Inc. is a Florida corporation with its principal place of business in Boca Raton, Florida.

9.      Defendant Cohen is an individual who resides in Livingston, New Jersey.

10.     Greg Cohen Promotions, LLC ("GCP") is a limited liability company organized under the laws of New Jersey with its principal place of business in Livingston, New Jersey. Upon information and belief, its sole member is Cohen. Cohen formed GCP in 2011 to engage in the business of boxing promotion. To conduct the business of boxing promotion, GCP is required to register with state boxing authorities in jurisdictions where bouts take place. Upon information and belief, Cohen ceased using GCP for his boxing business by the end of 2022.

11.     Bulldog Boxing Promotions LLC ("BBP") is a limited liability company organized under the laws of New Jersey with its principal place of business in Livingston, New Jersey. Upon

information and belief, its members are Cohen and Gino Limeri, an individual who resides in and is domiciled in New York. Upon information and belief, Cohen employed Limeri to act as BBP's President and as Cohen's agent. Limeri took direction from Cohen regarding the day-to-day operations of BBP. BBP is a successor entity to GCP.

## III.   JURISDICTION AND VENUE

12.    The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because Plaintiffs and Defendants are citizens of different states and the amount in controversy exceeds $75,000.

13.    Pursuant to 28 U.S.C. § 1391(b)(1), venue is proper in this District because all Defendants reside in this District.

## IV.   FACTUAL ALLEGATIONS

### A.    Background on boxing promotion

14.    In the boxing world, boxers, or fighters, typically enter into promotional agreements with promoters. These agreements are often exclusive, meaning that the boxer is permitted to work only with the contracting promoter for the duration of the contract. Such agreements are sometimes referred to as exclusive promotional agreements, or EPAs. An EPA provides for a profit-sharing arrangement between the promoter and the fighter; sometimes the EPA provides that profit-sharing will be separately negotiated for each fight in which the boxer participates.

15.    Upon signing an EPA, the promoter sometimes pays the fighter a signing bonus and agrees to cover certain expenses of the fighter such as training, travel expenses, and other fees. The promoter is responsible for marketing the fighter to fans to generate an audience for any bouts, as well as for organizing and promoting the fights themselves by contracting with a television

653426-8

network to air the fight, selecting and paying the venue, advertising the event, seeking sponsorships, and the like.

16.     Additionally, promoters will sometimes enter into co-promotional agreements with other promoters. Co-promotional agreements typically provide for a sharing of profits from an event or from a fighter participating in an event.

17.     The highest-paid fights involve those between ranked boxers. The ranking of boxers is overseen by one of four major sanctioning bodies. Sanctioning bodies will determine the rankings and sometimes order mandatory bouts between fighters. Championship belts are awarded to the winner of a sanctioned title bout in various weight classes. The WBA is one of the sanctioning bodies.

**B.     Honig lends money to support Cohen's business.**

18.      Beginning in 2012, Cohen and GCP sought funding from Honig to assist with financing Cohen's boxing business.

19.     In addition to Honig personally, GRQ also lent money to Cohen, GCP, and BBP. The initial agreement was that Plaintiffs would be repaid from profits related to specific bouts involving GCP's fighters. But despite Defendants' constant promises of repayment and of lucrative bouts, repayments by Cohen, GCP, or BBP were few and far between.

20.     By October 2019, Cohen and GCP owed over $1 million to Plaintiffs.

**C.     In November 2019, GCP enters into an agreement with Plaintiffs to settle his then-outstanding debt**

21.     On or about November 5, 2019, Cohen and GCP, on the one hand, and Honig and GRQ, on the other, entered into a Stipulation and Standstill Agreement (the "Standstill Agreement" or "Agreement"). The Standstill Agreement is attached as Exhibit A.

22.     The Agreement acknowledged that GCP then owed Honig and GRQ $1,026,000. Under the Agreement, Honig and GRQ would not enforce their claims against GCP and Cohen related to the outstanding debt provided that Cohen and GCP "strictly compli[ed]" with the terms of the Agreement.

23.     Section 2 of the Agreement provided that GCP would repay its debts to Plaintiffs by sharing all of its gross revenues from fights with Honig and GRQ. The amount of revenue sharing depended on whether GCP was the lead promoter and how much revenue was generated from the fight.

24.     In Section 2(d) of the Agreement, Cohen personally guaranteed the payment obligations of GCP.

25.     In Section 2(g) of the Agreement, GCP also agreed to pay Honig and GRQ 40% of its gross revenues generated by certain fighters after the full repayment of the then-accrued loan balance as long as those fighters were under contract with GCP or any affiliate of Cohen or GCP. One of those fighters was Jarrell Miller.

26.     Section 3 of the Agreement granted Honig and GRQ full access to GCP's books and records. Specifically, it required GCP to (i) open a new bank account for all future GCP receipts, (ii) provide Honig and GRQ with a copy of all EPAs in advance of a fight, (iii) account to Plaintiffs for revenues received within 20 days of a fight, and (iv) provide Plaintiffs with any information or documentation requested by them for the purpose of verifying GCP's compliance with the Agreement.

27.     Section 4 of the Agreement provided that Plaintiffs would be owed an automatic additional $125,000 (denominated "liquidated damages") on top of any remaining debt if GCP failed to make any of the required payments under the Agreement.

653426-8

28.     Section 16 of the Agreement further provided that if GCP ceased operations, the loan balance would "immediately come due in full."

29.     Section 17 of the Agreement prevented Cohen or GCP from operating a boxing business other than in their own names and/or otherwise circumventing Plaintiffs' rights under the Agreement.

30.     Defendants have been in breach of each of the above-described provisions, in some cases almost since it was first signed.

**D.     In October 2020, GCP and Cohen modify the Standstill Agreement**

31.     On October 13, 2020, Cohen and GCP, on the one hand, and Honig and GRQ, on the other, amended the Standstill Agreement ("Standstill Addendum"). The Standstill Addendum is attached as Exhibit B.

32.     The Standstill Addendum acknowledged that Cohen had paid Plaintiffs only $8,000 since the Standstill Agreement was signed and that Cohen and GCP still owed Plaintiffs a balance of at least $1,018,000.

33.     The Standstill Addendum also made clear that Plaintiffs reserved all rights to recover any unpaid debt.

34.     The Standstill Addendum also provided that Plaintiffs would make another $40,000 payment to Cohen/GCP and set forth revised revenue sharing for certain fights involving Bogdan Dinu.

35.     In reliance on this agreement, Honig wired $40,000 to GCP on October 13, 2020; the Standstill Addendum expressly acknowledged that "[t]he new balance [owed by GCP and Cohen to Plaintiffs] is $1,058,000."

### E.   BBP assumes GCP's debt to Plaintiffs and enters into new agreements with Honig

36.    Approximately six months after the parties entered into the Standstill Addendum, it became clear that Cohen had begun to use BBP and Limeri to conduct his boxing promotion business. Cohen and Limeri acknowledged that BBP was GCP's successor and that it would be liable for GCP's and Cohen's outstanding debts to Plaintiffs.

37.    On April 13, 2021, BBP and Honig entered into a Memorandum of Understanding (the "Miller MOU") whereby BBP promised that it would (a) reimburse Plaintiffs for all moneys that they had advanced for the fighter Jarrell Miller and (b) repay all outstanding debt of Cohen and GCP. After those amounts had been paid, BBP would share with Honig, on a 50/50 basis, revenues from BBP's EPA with Miller. The Miller MOU is attached as Exhibit C.

38.    In an email dated May 14, 2021 to Honig, copied to Cohen, Jonathan Schwartz of BBP attested that BBP had instructed another promoter to send the revenues from a June 5, 2021 fight between Bogdan Dinu and Daniel Dubois to Honig's designee "as debt repayment from GCP/Greg Cohen." This email is attached as Exhibit D. Honig trusted that these moneys would be paid, and continued to loan money to Defendants because Cohen had previously provided him with a fully executed agreement between BBP and the other promoter related to a potential Dubois-Dinu bout.

39.    On October 3, 2021, BBP, Honig, and Cohen entered into a Memorandum of Understanding (the "October 2021 MOU") that further modified the Standstill Agreement and Standstill Addendum. The October 2021 MOU is attached as Exhibit E.

40.    The October 2021 MOU modified the parties' revenue sharing arrangements as set forth in the Standstill Agreement and Addendum. Specifically, the October 2021 MOU provided that BBP would pay Honig or his designee 80% of the "next $1,800,000 in revenue received by

8

653426-8

BBP" and the remaining 20% as directed by Cohen. It further provided that any reimbursement of expenses advanced by Honig would be remitted 100% to Honig or his designee. After BBP earned $1,800,000 in revenue and Honig's advances had all been reimbursed, Honig and Cohen would split all revenue 50/50.

41.     The October 2021 MOU contained a carve-out for any compensation received as a result of a Daniel Dubois bout, allowing BBP to retain just $10,000 for each bout. It also contemplated further discussions related to the splitting of revenue for Dubois.

**F.      In 2021 and 2022, Plaintiffs extend additional financing to GCP and BBP**

42.     After execution of the Standstill Addendum, in response to (typically written) requests from Cohen, Plaintiffs loaned the following amounts to GCP and BBP directly, or on their behalf to third-party vendors or fighters specified by them or Cohen:

| Date | Amount | Payment to |
|------|--------|------------|
| 11/12/2020 | $25,000.00 | GCP |
| 3/9/2021 | $7,400.00 | Fighter loan |
| 3/22/2021 | $24,000.00 | GCP |
| 4/19/2021 | $7,500.00 | Fighter loan |
| 6/29/2021 | $15,000.00 | Fighter loan |
| 7/15/2021 | $46,000.00 | GCP |
| 7/27/2021 | $35,000.00 | GCP |
| 9/1/2021 | $15,000.00 | Fighter loan |
| 9/8/2021 | $92,500.00 | GCP |
| 9/21/2021 | $15,000.00 | Third-party vendor |
| 10/20/2021 | $30,000.00 | GCP |
| 11/4/2021 | $15,000.00 | Fighter loan |
| 11/5/2021 | $53,500.00 | GCP |
| 11/16/2021 | $7,400.00 | GCP |
| 12/10/2021 | $7,500.00 | Fighter loan |
| 12/10/2021 | $36,000.00 | GCP |
| 12/29/2021 | $10,000.00 | BBP |
| 2/3/2022 | $10,510.00 | BBP |

| | | |
|---|---|---|
| **3/11/2022** | $13,300.00 | BBP |
| **4/15/2022** | $9,365.00 | Third-party vendor |
| **4/15/2021** | $10,800.00 | Third-party vendor |
| **4/21/2022** | $5,000.00 | Third-party vendor |
| **4/28/2022** | $12,750.00 | BBP |
| **5/17/2022** | $8,500.00 | BBP |
| **6/13/2022** | $5,000.00 | Fighter loan |
| **7/1/2022** | $7,415.00 | Third-party vendor |
| **7/11/2022** | $10,000.00 | BBP |
| **7/20/2022** | $13,400.00 | BBP |
| **7/20/2022** | $15,887.50 | Fighter loan |
| **8/10/2022** | $13,750.00 | BBP |
| **8/16/2022** | $12,650.00 | BBP |
| **8/30/2022** | $25,000.00 | Third-party vendor |
| **9/7/2022** | $7,500.00 | Third-party vendor |
| **9/23/2022** | $3,875.00 | Third-party vendor |
| **10/12/2022** | $7,405.00 | Third-party vendor |
| **10/14/2022** | $54,250.00 | BBP |
| **10/19/2022** | $12,500.00 | Third-party vendor |
| **10/24/2022** | $12,500.00 | BBP |
| **10/25/2022** | $9,000.00 | Fighter loan |
| **11/3/2022** | $19,750.00 | BBP |
| **11/15/2022** | $25,000.00 | Third-party vendor |
| **11/23/2022** | $14,000.00 | BBP |
| **12/1/2022** | $15,000.00 | Third-party vendor |
| **TOTAL** | **$795,907.50** | |

\*\*\*

43.     Thus, in total, from the date of signing the Standstill Addendum through December 1, 2022, Cohen and his affiliates have racked up a debt as follows:

| Date | Amount | Recipient |
|---|---|---|
| **10/13/20** | $1,058,000 | Loan balance as of date of Standstill Addendum (see ¶ 35) |
| | $125,000 | Standstill Agreement "liquidated damages" (see ¶ 27) |

| 11/12/20-12/01/2022 | $795,907.50 | Additional loan payments (see ¶ 42) |
|---|---|---|
| **TOTAL** | $1,978,907.50 | |

44.     Yet, since signing the Standstill Addendum, Cohen, GCP, and BBP have only paid Plaintiffs $341,486.79, leaving Cohen, GCP, and BBP with a balance of $1,637,420.71 in unpaid debt to Plaintiffs. Cohen, GCP, and BBP are liable to Cohen for those amounts pursuant to the Standstill Agreement, Standstill Addendum, Miller MOU, and October 2021 MOU.

45.     And Cohen, GCP, and/or BBP have earned revenues that they failed to share, in violation of the operative agreements.

46.     In emails dated September 2, 2022, Cohen solicited $7,500 from Plaintiffs to cover the training expenses for fighter Hasim Rahman, Jr. Cohen told Honig that BBP would earn $40,000 on a fight between Rahman and Victor Belfort. Belfort was eventually replaced by Greg Hardy. The Rahman-Hardy fight went forward on November 23, 2022. Plaintiffs learned that BBP received over $120,000 for that fight. Not only was Honig due payment pursuant to the parties' contracts for the sharing of revenues, but Honig also was owed reimbursement for his advancement of Rahman's expenses.

47.     Honig repeatedly demanded that Cohen turn over the monies due to Plaintiffs from the Rahman-Hardy fight, as required by BBP's agreements with Plaintiffs. But BBP never paid Plaintiffs and instead kept the net proceeds for itself.

48.     On or about March 18, 2023, Miller fought Lucas Brown, resulting in revenue to BBP. But BBP did not remit any money earned from that fight to Plaintiffs either – a breach of its contractual obligations.

49.     Based upon information and belief, Defendants continue to operate a boxing business and earn revenues from sanctioned bouts. A percentage of those revenues is owed to Plaintiffs under their agreements with Cohen, GCP, and/or BBP.

653426-8

50. Plaintiffs have identified the following boxing events, all of which involved BBP fighters (bolded below) which have taken place, or will take place, just since January 1, 2023. Many of the bouts listed are high-earning WBA Title Bouts.

a. January 5, 2023 – **Partick Aryee** v. Bright Ayala – Ghana

b. January 13, 2023 – **Fernley Feliz Jr**. v. Deon Ronny Hale – Murfreesboro, TN

c. February 18, 2023 – **Wifredo Flores** v. Gary Cully – Nottingham, UK – WBA Title Bout

d. March 5, 2023 – **Solomon Adebayo** v. Gbenga Oluokun – Lagos

e. March 18, 2023 – **Jarrell Miller** v. Lucas Browne – Dubai

f. May 18, 2023 – **Keith Hunter** v. Javonn Davis – Connecticut

g. May 27, 2023 – **DeMichael Harris** v. Aaron Martinez – Atlanta

h. May 27, 2023 – **DeCaree Scott** v. Aaron Chavers - Atlanta

i. May 28, 2023 – **Solomon Adebayo** v. Musa Ntege – Lagos

j. June 1, 2023 – **Ablaikhan Khussainov** v. Artur Subkhankulov – Moscow

k. June 2, 2023 – **Keith Hunter** v. David Grayton - Connecticut

l. June 9, 2023 – **Carlos Canizales** v. Daniel Matellon – Buenos Aires – WBA Title Bout

m. June 9, 2023 – Carlos Canizales v. **Daniel Matellon** – Buenos Aires – WBA Title Bout

n. June 10, 2023 – **Ivan Dychko** v. Ariel Esteban Bracamonte – Buenos Aires – WBA Title Bout

o. June 10, 2023 – **Keith Hunter** v. Vlad Panin – Connecticut

p. June 13, 2023 – **Fernley Feliz Jr** v. Terrence Walker – Nashville, TN

q. July 22, 2023 – **Patrick Allotey** v. Serhii Bohachuk – Santa Ynez, CA – WBA Title Bout

r. July 30, 2023 – **Solomon Adebayo** v. Issac Ekpo – Lagos

s. August 15, 2023 – **Keith Hunter** v. Javonn Davis – Long Beach, CA

12

     t.    August 19, 2023 – **Bastie Samir** v. Cleotis Pendarvis – Denver, CO

     u.    August 11, 2023 – **Vaugh Alexander** – St. Louis, MO

     v.    August 26, 2023 – **Daniel Dubois** v. Oleksander Usyk – Poland – WBA, WBO, IBO, IBF Title bout

51.    Defendants have failed to share any revenues from any of these fights.

52.    Upon information and belief, Cohen and BBP received promotional monies from other undisclosed events involving BBP-promoted fighters and failed to pay Plaintiffs monies they were due under the parties' agreements.

**G.    GCP is liable to Honig on notes issued to HS Contrarian Investments, LLC**

53.    In or about February 2023, HS Contrarian Investments, LLC ("HSCI") assigned to Honig notes that it held that were issued by GCP and Cohen for a total principal amount of $215,800 plus interest.

54.    Those notes are due and payable now and GCP and Cohen are now liable to Honig for the $215,800 plus accrued and accruing interest.

**H.    Cohen repeatedly lied to Honig to extract payments supposedly for business-related expenses, but Cohen just pocketed the money**

    **1.    Payments associated with Mickey Bey**

*August 2019 - $40,000 payment*

55.    In an August 2, 2019 conversation, Cohen requested $40,000 from Honig to fund a signing bonus for fighter Mickey Bey whom Cohen claimed would be fighting soon and whose fight could yield a purse of $500,000 for GCP. At the time, Cohen had outstanding debt due to Honig and promised Honig that the $40,000 advance to Bey would be paid back when the debt was repaid, which would be on August 6, 2019.

56.    In reliance on these promises, on August 5, 2019, Honig caused $52,500 to be wired to GCP, of which $40,000 was for the Mickey Bey signing bonus.

653426-8

57.     Not only did the promised repayment of the debt never come, but, upon information and belief, Defendants never paid Bey the signing bonus.

### 2.     Payments associated with Bastie Samir

*December 2020 - $165,000 to GCP*

58.     On December 3, 2020, Cohen requested $165,000 from Honig for the purpose of purchasing the promotional rights for eight African fighters (one of which was Bastie Samir) from LPMG Global, LLC. Cohen also told Honig that these rights could be simultaneously sold to MTK Global for $265,000, netting a quick $100,000 profit which would pass directly through to Plaintiffs and be applied to their outstanding loans. The putative GCP-MTK purchase agreement also allowed for GCP to retain a 25% interest in promotional revenues from future fights involving those eight fighters.

59.     On December 3, 2020, Cohen executed an Assignment and Assumption Agreement with LPMG.  A copy of this agreement is attached as Exhibit F.

60.     On December 3, 2020, Honig also entered into a Memorandum of Understanding with Cohen memorializing that, among other things, Honig would recoup $165,000 plus a percentage of GCP's net profits derived from these fighters. A copy of this agreement is attached as Exhibit G.

61.     On December 4, 2020, in reliance on these statements, Honig caused $165,000 to be wired to GCP.

62.     After Honig wired the money, he learned that MTK Global was affiliated with a drug cartel that had been sanctioned by the U.S. government – a fact of which Cohen was aware prior to soliciting the $165,000 payment from Honig. Cohen never had any intention of selling any rights to MTK Global.

653426-8

63.     On top of that, upon information and belief, Cohen never even purchased the promotional rights from LPMG but instead used the $165,000 for other purposes.

64.     Plaintiffs subsequently learned that in March and April 2021, Cohen entered into EPAs with three of the eight fighters (Emile Don Safari (aka "Kalekuzi"), Jesse Manyo Plange, and Samir), that were supposedly part of the December 2020 deal. Cohen never would have had to contract with those fighters then if he had actually acquired their promotional rights in December 2020 as he told Honig that he had.

*March 2021 - $24,000 payment to GCP*

65.     In subsequent emails including on March 4, 2021, Cohen continued to tout to Honig the profitability prospects of one of the eight African fighters (Samir) whose promotional rights had supposedly been purchased by GCP in December 2020.

66.     On March 22, 2021, Cohen solicited $24,000, which was supposed to cover the visa expenses of Samir and another boxer. In reliance on Cohen's statements, Honig wired $24,000 to GCP to cover these visa expenses.

67.     Upon information and belief, GGP used some or all of the $24,000 to bribe WBA officials to rank Samir in the WBA light heavyweight division. Although Cohen claimed to Honig in material attached to a December 27, 2020 email that Samir was scheduled to fight a bout in Africa in January 2021, which would place him in the WBA rankings, Samir did not have a January 2021 bout. In fact, Samir had not fought at all in the previous 15 months and was not ranked by the WBA prior to February 28, 2021. Approximately three weeks after Honig's $24,000 payment to GCP, the WBA ranked Samir as the #13 contender for the "light heavyweight" division.

68.     Further, contrary to statements by Cohen, Samir was never scheduled to fight in the U.S. and so there was no need for him to obtain a US visa.

*September 2021 - $15,000 payment to GCP*
*December 2021 - $15,000 payment to BBP*

69.     On September 7, 2021, Cohen claimed that Samir's opportunity to fight Badou Jack for the WBA light heavyweight title had been rescheduled for November 20, 2021. Cohen then asked for $15,000 to cover Samir's training expenses. Cohen promised the bout would generate $250,000 for GCP and Honig would recoup his $15,000 payment as well.

70.     On September 8, 2021, in reliance on Cohen's representations, Honig sent GCP $107,500, of which $15,000 was supposedly going to be used for Samir's training expenses. (The balance supposedly would cover advances and fees for other GCP fighters.)

71.     On the morning of the November 20, 2021 bout, Cohen emailed Honig that Samir had tested positive for COVID and "the bout is being rescheduled for January/February" 2022.

72.     These statements by Cohen were false or misleading; Samir was never scheduled to fight Jack. By September 2021, Jack and Samir were in different weight classes and on November 26, 2021 (six days after the supposed planned but postponed date for the Samir/Jack bout), Jack fought a different boxer, Samuel Crossed, in Dubai. In fact, the WBA stopped ranking Samir in October 2021. Honig, however, did not know this at that time.

73.     On December 9, 2021, Cohen sent an email to Honig in which Cohen solicited him for an additional $15,000 to pay for Samir's training for his supposed upcoming bout against Jack.

74.     On December 23, 2021, Cohen claimed that a Samir/Jack fight would happen on February 26, 2022, and forwarded Honig a copy of a purported Provision of Services Agreement ("POS") between GCP and promoter Probellum USA Corporation. Cohen claimed that the Samir bout would yield a $300,000 purse, and if Samir were to win, the bout would generate $600,000. Cohen requested $45,620 for various fighter related expenses, including $15,000 for Samir's training expenses.

16

75.     On December 24, 2021, in reliance on Cohen's email, Honig wired BBP $35,000 which included the $15,000 for Samir.

76.     But the February 2022 fight never materialized either, with Cohen misleadingly claiming that Samir had missed weight.

77.     Plaintiffs later learned from a Probellum officer that there never was a scheduled Samir/Jack bout and that the POS provided by Cohen was fraudulent.

### 3.     Payments associated with Carlos Canizales

*March -May 2021 - $135,500 to GCP*

78.     In conversations in early March 2021, Cohen told Honig that GCP had signed boxer Carlos Canizales and provided Honig with a copy of an EPA between GCP and Canizales. A copy of the EPA is attached here as Exhibit H.

79.     In an email dated March 4, 2021, Cohen told Honig that Canizales would make his third title in the second quarter of 2021, which would yield enough money to pay back a $60,000 advance and earn a $100,000 promotional fee.

80.     In reliance on these statements, on March 4, 2021, Honig wired $60,000 to GCP to cover Canizales' signing bonus.

81.     In an April 1, 2021 email, Cohen asked Honig for an additional $18,000 for a visa for Canizales and two members of his support team so that he could fight a boxer in Texas. In reliance on these statements, Honig wired $18,000 to GCP.

82.     In a May 25, 2021 email, Cohen asked Honig for an additional $57,500 to fund a fight between Canizales and Esteban Bermudez. The $57,500 was allegedly for a payment to Bermudez to agree to fight Canizales, plus travel costs. Cohen claimed that this was a mere "tune up" bout for Canizales, and the WBA would next order a bout against WBA Super Champion

653426-8

Kyoguchi. Cohen claimed Honig would recoup the $60,000 Canizales signing bonus, the $57,500 Bermudez payment, and the $18,000 in visa expenses – for a total of $135,500.

83.     Cohen also provided Honig with a signed agreement, dated May 25, 2021, promising him repayment for this fight and at least $100,000 from the upcoming Kyoguchi bout. This agreement is attached as Exhibit I.

84.     Cohen also claimed that "in the event that Bermudez is victorious GCP has secured 100% of his rights moving forward and the economics for the Kyoguchi bout (including recoupment) will be the same as Canizales V. Kyoguchi." These claims by Cohen all but guaranteed six figure profits to Honig.

85.     In reliance on these statements, Honig wired an additional $57,500 to GCP on May 25, 2021.

86.     On May 28, 2021, Canizales lost to Bermudez. GCP did not share any revenues from this bout with Honig.

87.     Upon information and belief, payments made by Honig to fund signing bonuses and bout fees were used by Defendants as payoffs to the WBA to order a mandatory bout to the winner of the Canizales – Bermudez bout. Cohen secured Bermudez immediately after his win over Canizales only because Cohen had already paid the WBA to have the winner be named mandatory challenger to Kyoguchi.

### 4.     Cohen lied to Honig to induce payments supposedly for credit with WBA but which actually were for bribes to the WBA

*January 2021 - $60,000 to GCP*

88.     On or about December 28, 2020, Cohen requested a $60,000 loan from Honig supposedly to purchase prepayment credits toward future sanctioning fees. According to a

December 30, 2020 email from Cohen to Honig, prepayment of $60,000 in sanctioning fees would give GCP a $180,000 credit with the WBA toward any such future fees.

89.     Cohen claimed that the credit would be needed for future fees and it would help the WBA out financially, given the loss of revenues the WBA experienced from cancelled events due to COVID.

90.     Honig then spoke with Cohen's attorney, who (presumably not aware of all the facts) confirmed the lawfulness of this transaction. Cohen also provided Honig with a purported letter signed by WBA President Gilberto Mendoza confirming the promised credits. A copy of the purported letter is attached as Exhibit J.

91.     On January 6, 2021, in reliance on Cohen's and his lawyer's statements, and the purported WBA letter, Honig wired $60,000 to GCP.

92.     But Cohen lied to Honig and, on information and belief, to Cohen's lawyer.

93.     In December 2020, Mendoza disclosed to Cohen that the WBA would be taking action against WBA Heavyweight Champion Mahmoud Charr, which ultimately resulted in stripping Charr of his title. Upon information and belief, Cohen made payments to Mendoza with the intent to induce Mendoza to order a title eliminator match between GCP's Bogdan Dinu and Queensberry Promotions' Daniel Dubois, the winner of which would be granted the right to contend for the high-stakes WBA heavyweight title against Trevor Bryan.

94.     Upon information and belief, BBP "obtained" this right shortly after Honig loaned the $60,000 to GCP and Cohen. Upon information and belief, Cohen paid Mendoza for this right.

95.     Cohen's statements to Honig in December 2020 and January 2021 were therefore false or misleading; on information and belief, the monies were used to secure a challenger bout and not for the purposes that Cohen had represented to Honig.

19

*July 2021 - $35,000 to GCP*

96.     In an email sent on July 27, 2021, Cohen told Honig that GCP needed $35,000 to apply for a "special permit fee" to get Samir into a WBA light heavyweight title fight which would take place in September 2021. According to Cohen, the bout would generate between $150,00-$300,000 of revenues if Samir participated in the fight. In reliance on these representations, Honig wired $35,000 on or about July 27, 2021.

97.     Cohen sent Mendoza an email requesting to confirm the promise to refund the $35,000 if a bout did not take place. Mistakenly, Cohen sent it to Mendoza's WBA domain address. Immediately thereafter, Cohen sent the same email to Mendoza's gmail account, the contents of which on information and belief are not preserved on WBA's systems. These emails are attached as Exhibit K. Unlike with earlier agreements, Mendoza did not memorialize this commitment in any kind of formal agreement or letter. Instead, Mendoza confirmed the refund agreement in an email sent from his Gmail account:

> **From:** Gilberto Mendoza <gilbertojesusjrwba@gmail.com>
> **Date:** July 27, 2021 at 9:56:20 AM EDT
> **To:** Gcohen <gcohen@gcpboxing.com>
> **Subject: Re: Bastie Samir**
>
> yes, confirmed
>
> On Tue, Jul 27, 2021 at 9:52 AM Gcohen <gcohen@gcpboxing.com> wrote:
> Gilberto, as per our conversation this morning, please confirm that after filing the Expedited Special Permit for Bastie Samir to fight for the WBA Light Heavyweight World Championship, in the event that Samir is not granted the World Title opportunity the $35,000 fee will be reimbursed to GCP.
>
> Thank you
>
> Gregory D. Cohen

20

98.     Upon information and belief, at least some of the $35,000 that Plaintiffs loaned to Defendants was not used to pay for a WBA special permit fee. In fact, the $35,000 solicited by Cohen was $15,000 more than the fee listed in the WBA's regulations for Samir's weight class (175 lbs.). Upon information and belief, Mendoza retained the difference for himself.

*October 4, 2021 - $100,000 to GCP*

99.     On September 27, 2021, Cohen again requested a $100,000 loan from Honig supposedly to purchase additional WBA credits. Honig's $100,000 payment plus a $25,000 contribution from Cohen was supposed to give GCP a $250,000 credit with the WBA which would cover future sanctioning fees. Again, Cohen provided Honig with a purported letter signed by Mendoza confirming this agreement. The terms of this letter allowed GCP to make a demand for repayment in lieu of credits and the WBA would be required to make payment within 72 hours. A copy of this letter is attached as Exhibit L. Again, Honig sought and received assurances from Cohen's attorney (who presumably was not aware of all the facts) that the deal was proper.

100.    On October 4, 2021, Cohen confirmed the details of their agreement as follows:

| From: | Greg Cohen <gcohen@colonialventuresllc.com> |
|---|---|
| Sent: | Monday, October 4, 2021 4:00 PM |
| To: | brhonig@aol.com |
| Subject: | Loan |

Barry, you have loaned GCP & Greg Cohen $100k which is being used to prepay sanctioning fees with the WBA.  You are not a party to any agreements between Greg Cohen & GCP with the WBA. The $100,000 you are extending will be returned after the November 20th Samir WBA Title bout.  As per GCP's September 29th agreement with the WBA, GCP will be receiving $125,000 from the WBA after GCP notifies the WBA in writing within 72 hours of said bout that they are electing to have their capital returned rather than receive the 2 to 1 credit on WBA fees.  Upon receipt of the $125,000 wire from the WBA, GCP will immediately return the $100,000 loan to Barry Honig.  The $100,000 will be returned before December 10th, 2021.

Thank you



**Gregory D. Cohen**
Chief Executive Officer

**Colonial Ventures LLC**

GCohen@ColonialVenturesLLC.com
**(973) 699-4714** (C)
**(212) 851-6425** (W)
**(212) 208-4472** (F)

101.    In reliance on Cohen's and his attorney's statements, which were memorialized in the October 4 email from Cohen, as well as the WBA letter, Honig wired $100,000 to GCP on October 4, 2021.

102.    But the Samir fight referenced in Cohen's October 2021 email supposedly scheduled for November 20, 2021 never happened.

103.    Cohen stated to Honig that he would get his money back after the next Samir fight.

104.    In March 2022, Honig inquired about the status of the "WBA loan."

105.    Cohen responded, coming to the WBA's and Mendoza's defense, that "the wba loan is not overdue it's current according []to the terms of the agreement."

106.    On April 4, 2022, Cohen assured Honig via email that he expected the WBA would be returning the $100,000 by "end of April."

107.    On May 25, 2022, Cohen told Honig via text message the WBA would be turning over their sanction fee from "our event," or $150,000.

108.    Then on August 20, 2022, Cohen told Honig that he would get back his $100,000 loan from the next fight in which fighter Daniel Dubois participated.

109.    GCP never returned Honig's $100,000.

110.    On December 20, 2022, Plaintiff Honig and two other individuals had a conversation about the $100,000 payment with a GCP/BBP heavyweight fighter, who confirmed that Cohen used the $100,000 to pay off the WBA for the purpose of improving his rankings in the WBA. The fighter expressly stated that he was happy for Cohen's actions because it would allow him to fight for the high-value title match sooner, i.e. without having to go through the normal process of moving up the rankings.

111.    Again, Cohen's statements were false. Based on the information from this GCP/BBP heavyweight fighter, Cohen used at least some of the $100,000 payment from Honig to pay the WBA to expedite the normal ranking process.

**5.    Additional payments to BBP were used for Cohen's personal expenses**

*December 2021 – at least $35,000 to BBP was used for personal expenses*

112.    In a December 23, 2021 email, Cohen solicited Honig for $45,620 purportedly to pay for training and other expenses for multiple boxers. Cohen claimed that these monies were specifically earmarked for the following fighter-related expenses: Adebayo ($5,000); Feliz ($13,620 – airfare, hotel, meals for January 7 bout); Samir ($15,000 – advance); Plange ($12,000 – training).

113.    In reliance on Cohen's statements, Honig wired $35,000 to BBP on December 24 and $10,000 on December 29, 2021.

114.    More recently, Limeri emailed Honig copies of BBP's Wells Fargo bank statements from the period of October 2021 through February 2022.

115.    Based on Plaintiffs' review of those statements, Cohen used most, if not all, of the funds from Honig for Cohen's personal purposes instead of the purported business reasons he claimed. Of the $45,000 wired to BBP, Plaintiffs have identified at least $35,667.05 of funds Cohen diverted for apparently personal expenses: Bob's Discount Furs ($7,082.29), Cashed Check ($20,000), Premier Capital – personal loan payment ($1,500), Seminole Casino – cash withdrawal ($7,084.75).

116.    Plaintiffs were able to positively identify approximately $1,400 that were allocated to GCP / BBP fighters.

*February 2022 – at least $13,190 to BBP was used for personal expenses*

117.    In a January 31, 2022, email, Cohen solicited Honig for $23,700 purportedly to pay for expenses related to three fights. Cohen detailed the following specific fighter-related expenses: Fernely Feliz ($18,500 – travel and related expenses for Chris Arnold bout on February 5, 2022), Solomon Adebayo ($2,700 – Haruna Osumanu bout on February 4, 2022), Solomon Adebayo ($2,500 – Nii Offei Dodoo bout on February 18, 2022).

118.    In reliance on Cohen's statements, Honig wired $23,700 to BBP on February 3, 2022.

119.    Upon information and belief Cohen used many of these funds for Cohen's personal purposes instead of for the Feliz-Adebayo bouts.

120.    Plaintiffs have identified potentially up to $10,510 of funds applied to the Feliz bout expenses.

121.     Cohen used $3,084.99 for a recipient, Superior Homes, which Plaintiffs believe was a personal expense, and made $2,340.85 in cash withdrawals at the Seminole Casino in Hollywood, Florida. Upon information and belief, the remainder of the February 3, 2022 wire was used for personal expenses.

122.     Adebayo did not fight any of the bouts Cohen claimed were occurring either.

123.     Upon information and belief, Cohen diverted additional monies he received as loans from Honig for alleged boxing events for his personal benefit.

**6.     Payments associated with Gary Cully and Keith Hunter**

*July 2022 - $25,000 to BBP*
*August 2022 - $7,500 to BBP*

124.     In an email dated July 13, 2022, Cohen told Honig that BBP could sign a ranked fighter named Gary Cully and that Cohen needed to give Cully a $25,000 signing bonus. Cohen told Honig that the bout between Cully and Hunter supposedly scheduled for September in the United Kingdom would generate $50,000 in revenue. Cohen had had Hunter under contract since 2018.

125.     Cohen told Honig that BBP and another promoter, Probellum, were entering into or had entered into an EPA with Cully that would result in BBP earning the $50,000 promotional fees but also up to $500,000 depending on who won the fight. Cohen claimed that if Hunter won the fight, the WBA would make him a mandatory challenger to a title bout, which would yield $500,000.

126.     In reliance on these and other statements by Cohen, on July 14, 2022, Honig wired to BBP $62,500, $25,000 of which was for Cully's bonus.

127.     On July 15, 2022, Cohen provided Honig with a copy of the supposed co-promotional rights agreement between BBP and Probellum regarding Gary Cully and the EPA

between BBP, Probellum, and Cully to justify his loan request. A copy of these documents are attached here as Exhibit M.

128.    On August 8, 2022, Cohen solicited Honig for $7,500 for housing and training expenses for Hunter for the alleged upcoming Cully bout, informing Honig that the Cully-Hunter bout was on for September 30, 2022.

129.    In reliance on Cohen's statements about the upcoming bout and need for training, on August 10, 2022, Honig wired $27,000 to BBP, $7,500 of which was for housing and training for Hunter.

130.    But Cohen kept changing the purported date of the Cully-Hunter fight from September 2022 to October 2022. On October 30, 2022, in response to a question from Honig asking if "Hunter won," Cohen responded "Cully won." But this was highly misleading. Cully had not fought Hunter on October 29, but an entirely different fighter.

131.    Then in a text message sent on November 2, 2022, Cohen told Honig that Probellum had assigned its portion of the promotional rights for Cully to Matchroom Boxing.

132.    But this was a lie. Plaintiffs now understand that Cully had actually signed a promotional agreement with Matchroom Boxing months earlier in August 2022 and was never signed on with Probellum at all.

133.    Plaintiffs further understand that Cully never signed any agreement with BBP, GCP, or Cohen and that there was never any fight planned between Hunter and Cully. The purported agreement among BBP, Probellum, and Cully was, Plaintiffs understand, a forgery.

### 7.    Payments associated with Vladyslav Sirenko

*July 2022 - $37,500 to BBP*
*August 2022 - $5,750 to BBP*

134.    As with Cully, Cohen enticed Honig to loan moneys to BBP purportedly for another fighter, Vladyslav Sirenko, based on false promises that BBP would make $200,000 from a fight planned between Sirenko and Joe Joyce.

135.    On July 13, 2022, Cohen sent Honig an invoice seeking $25,000 for Sirenko's signing bonus and $12,500 was for his training expenses.

136.    In reliance on these statements, on July 14, 2022, Honig wired to BBP $62,500, $37,500 of which was for the Sirenko-related expenses.

137.    On July 15, 2022 – to bolster his story about the Sirenko expenses – Cohen sent Honig an email attaching a supposed EPA between BBP and Sirenko. This email and the supposed EPA are attached as Exhibit N.

138.    On August 8, 2022, Cohen claimed that he needed additional funds to cover Sirenko's and his trainer's visas for the upcoming fight with Joyce scheduled for September 24, 2022.

139.    In reliance on these statements, on August 10, 2022, Honig wired to BBP $27,000, $5,750 of which was for Sirenko-related expenses.

140.    On or about September 29, 2022, Cohen stated to Honig that Sirenko and BBP had entered into a "Step Aside Agreement" with Queensberry Promotions (Joyce's promoter), whereby BBP would be paid $100,000 for Sirenko to forgo a September bout scheduled between Sirenko and Joyce and instead fight Joyce in a December bout, which would result in a $450,000 payment to BBP. The $100,000 fee was to be paid within seven business days of the execution of the purported Step-Aside Agreement. A copy of the purported Step-Aside Agreement is attached as Exhibit O.

141.    On multiple occasions in October 2022, Frank Warren, the founder and principal of Queensberry, promised Honig the $100,000 step-aside monies were forthcoming to Honig specifically (as repayment of BBP's debt to Plaintiffs). But Queensberry failed to transmit the $100,000 step-aside fee as promised.

142.    Some time in November 2022, Cohen stated to Honig that the proposed December 2022 Sirenko-Joyce bout was cancelled and according to an agreement between BBP and Queensberry Promotions, a new fight would be rescheduled and take place within 90 days of December 3, 2022.

143.    On or about December 16, 2022, in response to an email from Honig, Cohen stated that "the Warrens have 100% satisfied any and all obligations to [BBP] and do not owe Bulldog anything." Additionally, Cohen stated "[y]ou are 100% aware that stating anything other than that the Warrens and Bulldog are in good standing with one another is false and malicious." If in fact BBP received funds from the Warrens/Queensberry, then BBP should have remitted that money to Plaintiffs based on the October 2021 MOU.

144.    On or about February 19, 2023, Sirenko's manager informed Honig that Sirenko did not have a contractual relationship with Defendants and never had a fight scheduled with Joyce.

145.    Based on the information from Sirenko's manager, Plaintiffs believe that the original Sirenko-Joyce bout and the EPA were fabrications invented to induce Honig to make the payments related to Sirenko. Defendants defrauded Honig either with the assistance of the Warrens and Queensberry, or Defendants also defrauded the Warrens and Queensberry when Defendants got them to enter into the Step Aside Agreement. Either way, and unbeknownst to Plaintiffs at the time, none of Honig's Sirenko-related payments to BBP were actually solicited for and applied to legitimate purposes.

*** 

146.    In total, Cohen's various lies resulted in Honig paying Cohen at least the following

amounts over a three-year period as follows:

| Date | Amount | Recipient |
|---|---|---|
| 8/5/2019 | $40,000 | GCP |
| 12/4/2020 | $165,000 | GCP |
| 1/6/2021 | $60,000 | GCP |
| 3/4/2021 | $60,000 | GCP |
| 3/22/2021 | $24,000 | GCP |
| 4/1/2021 | $18,000 | GCP |
| 5/25/2021 | $57,500 | GCP |
| 7/27/2021 | $35,000 | GCP |
| 9/8/2021 | $15,000 | GCP |
| 10/4/2021 | $100,000 | GCP |
| 12/24/2021 | $35,000 | BBP |
| 2/3/2022 | $13,190 | BBP |
| 7/14/2022 | $25,000 | BBP |
| 7/14/2022 | $37,500 | BBP |
| 8/10/2022 | $13,250 | BBP |
|  | **$698,440** |  |

**I.     Defendants steal at least $270,000 from Honig**

147.    In March 2021, BBP entered into a Co-Promotional Agreement with Queensberry

Promotions to co-promote a bout between Daniel Dubois and Bogdan Dinu that was scheduled to

take place on June 11, 2021.

148.    The terms of the Co-Promotional Agreement called for Queensberry to pay a

$700,000 fee to BBP.

149.    On May 14, 2021, Jonathan Schwartz of BBP stated to Honig via email that BBP

had instructed Queensberry to forward the entire fee due to BBP directly to Honig's designee as a

repayment of outstanding loans owed to Plaintiffs.

150.    On June 14, 2021, Queensberry wired $201,486.79 to Honig's designee, which represented only a portion of the fee to which Plaintiffs were entitled and which they had been promised.

151.    BBP and Queensberry negotiated a settlement agreement in September 2021 relating to the outstanding fees owed to BBP. In lieu of receiving the remaining fee, BBP agreed to receive interests in Dubois' next 5 bouts: 50% on fights 1-3, 40% on bout 4, and 35% on bout 5. A copy of the Settlement Agreement (Amendment to Agreements Between BBP and Queensbury) is attached as Exhibit P.

152.    Frank Warren and his son George Warren, the principals of Queensberry, made multiple promises to Honig that the funds and a long form agreement guaranteeing payment to BBP would be forthcoming.

153.    The Warrens continuously promised to Honig that they would execute documents and make the agreed-upon payments that were due under the Co-Promotional Agreement, but these payments never came and the long form agreement never materialized.

154.    Honig paid for attorneys to draft a complaint that BBP could file against Queensberry and the Warrens. Honig and/or the attorneys repeatedly asked Limeri, the putative authorized representative for BBP, for permission to file the draft complaint. Acting at Cohen's direction, Limeri withheld permission.

155.    Upon information and belief, the Warrens needed Cohen's relationship with WBA president Mendoza (whom Plaintiffs now understand Cohen was bribing), and so the Warrens, Cohen, and Limeri purposefully delayed a settlement.

156.    On November 18, 2022, in response to Honig's continued request for executed documents, George Warren confirmed his intention to pay BBP by December 3, 2022.

157.    On December 2, 2022, Honig, who was frustrated with the delay tactics of the Warrens, emailed his attorney, and included Cohen on the email, stating that if "[n]o wire or response by Tuesday we will need to proceed with litigation."

158.    Upon information and belief, Cohen reached out to George Warren and informed him of Honig's intentions and the risk that litigation would bring certain of their dealings to light. Within approximately seven hours of Honig's email copied to Cohen, George Warren emailed Honig, assured him that funds were forthcoming, and highlighted potential money-making opportunities the BBP-Queensberry relationship would generate in the near future. Warren stated: "we are acutely aware that in order for many of these things to transpire, we need cooperation from Greg and Gino." A copy of this email is attached as Exhibit Q.

159.    On December 7, 2022, Cohen emailed Warren confirming an earlier conversation that Queensberry would wire to BBP an "agreed upon" $270,000 and that "the only outstanding monetary issues between" BBP and Queensberry were the $100,000 step-aside "Sirenko POS fee" and finalizing a long-form agreement pertaining to Dubois.

160.    On December 8, 2022, Queensberry emailed an Acknowledgement and Release Letter to BBP acknowledging Queensberry was making payment to BBP of $270,000, which *included* a $100,000 "past due step aside payment" and that all matters between the parties were settled. A copy of this Acknowledgement and Release Letter is attached as Exhibit R.

161.    On December 8, 2022, Limeri immediately responded to Queensberry's Release Letter and responded that BBP was in agreement and accepted the terms of the Letter.

162.    The mutual release agreement amount, $270,000, was $100,000 less than the amount that was previously "agreed upon" according to the December 7, 2022 email.

163.    On or about December 12, 2022, Honig emailed George Warren requesting confirmation that the monies had been sent. Honig never received confirmation from any of Warren, Cohen, or Limeri that any funds had been transmitted.

164.    On December 13, 2022, the WBA ordered Usyk to face BBP/Queensberry fighter Dubois in a mandatory title defense.

165.    On or about December 16, 2022, Cohen stated in his email to Honig: "the Warrens (Queensberry) have 100% satisfied any and all obligations to Bulldog Boxing Promotions LLC and do not owe Bulldog anything."

166.    Upon information and belief, Cohen, Limeri and the Warrens conspired not to pay Honig the monies he was promised and purposefully led Honig to believe that he would be paid. After spending tens of thousands of dollars on attorneys to draft settlement and charging documents, Cohen and Limeri unilaterally accepted a one-page, last minute release agreement with Queensberry. Limeri and Cohen refused to permit the complaint to be filed on behalf of BBP. The alleged monies in the release agreement were substantially lower than what was previously agreed upon.

167.    Upon information and belief, Queensberry and/or BBP paid monies, directly or indirectly, to bribe Mendoza to order the mandatory Dubois-Usyk bout. Honig was entitled to those monies.

168.    Honig did not receive any monies from the BBP-Queensberry Release Agreement.

169.    Cohen, Limeri and BBP also did not share any agreement, contracts, or documents regarding the Dubois-Usyk bout as required by the parties' agreements.

653426-8

## COUNT 1

### BREACH OF STANDSTILL AGREEMENT AND RELATED AGREEMENTS
### (AGAINST COHEN, GCP, AND BBP)

170.    Plaintiffs reallege each and every allegation set forth in paragraphs 1 through 169 as though fully set forth here, and incorporates those allegations herein by reference.

171.    Plaintiffs and Defendants are parties to the Standstill Agreement, as amended and supplemented by the Standstill Addendum, Miller MOU, and October 2021 MOU (all of the foregoing, the "Financing Agreements").

172.    The Financing Agreements are valid and enforceable.

173.    As set forth above, the Financing Agreements created an obligation by GCP, BBP, and Cohen to pay back any amounts borrowed from Plaintiffs.

174.    Plaintiffs performed under the Financing Agreements. They loaned Cohen, GCP, and BBP at least $1,978,907.50, of which $1,637,420.71 remains outstanding and unpaid.

175.    Pursuant to the Financing Agreements, Cohen, GCP, and BBP were also required to share revenues for all bouts involving fighters promoted by Defendants (including the $270,000 settlement fee from Queensberry). Cohen, GCP, and BBP failed to share those revenues as required.

176.    Cohen, GCP, and BBP are now liable for $1,637,420.71, plus accrued and accruing interest.

## COUNT 2

### BREACH OF PROMISSORY NOTES
### (AGAINST GCP AND COHEN)

177.    Plaintiffs reallege each and every allegation set forth in paragraphs 1 through 169 as though fully set forth here, and incorporates those allegations herein by reference.

653426-8

178.    GCP and Cohen issued certain promissory notes ("Notes") in favor of HSCI.

179.    The Notes are valid and enforceable.

180.    As set forth above, the Notes created an obligation by GCP and Cohen to pay back any amounts borrowed from HSCI.

181.    HSCI assigned all of its rights and interests under the notes to Plaintiff Honig.

182.    HSCI performed under the Notes. It loaned GCP and Cohen a total of $215,800 and that amount remains outstanding and unpaid.

183.    GCP and Cohen are now liable for $215,800, plus accrued and accruing interest.

## COUNT 3

### FRAUD
### (AGAINST COHEN, GCP, and BBP)

184.    Plaintiffs reallege each and every allegation set forth in paragraphs 1 through 169 as though full set forth here, and incorporates those allegations herein by reference.

185.    As set forth above, Cohen, acting on behalf of himself, GCP, and/or BBP, made material false or misleading representations to Plaintiffs to induce them to wire cash to GCP or BBP.

186.    When Cohen made each of these statements, he knew that each statement was false or misleading and that Plaintiffs were relying on Cohen's statements.

187.    Plaintiffs reasonably and/or justifiably relied on Cohen's false statements.

188.    Had Cohen told the truth about the reasons for the requested payments, Plaintiffs would not have sent those payments.

653426-8

189.    As a direct and proximate result of Plaintiffs' reliance on Cohen's false and misleading statements, Plaintiffs have suffered damages in an amount to be determined at trial, but believed to be no less than $698,440.

## COUNT 4

### UNJUST ENRICHMENT (In the alternative to breach of contract)
### (AGAINST COHEN, GCP, AND BBP)

190.    Plaintiffs reallege each and every allegation set forth in paragraphs 1 through 169 as though full set forth here, and incorporates those allegations herein by reference.

191.    This Count is pled as an alternative to the Count for breach of contract to the extent that any applicable contract or arrangement is found not to exist or not to be enforceable.

192.    As set forth herein, Plaintiffs paid monies to GCP and/or BBP under false pretenses that the moneys would be repaid and/or were for proper business purposes.

193.    Cohen, GCP, and BBP benefited from receiving these moneys while not providing any benefit to Plaintiffs.

194.    The retention of that benefit by Cohen, GCP, and BBP is inequitable.

## COUNT 5

### ACCOUNTING
### (AGAINST COHEN, GCP, AND BBP)

195.    Plaintiffs reallege each and every allegation set forth in paragraphs 1 through 194 as though full set forth here, and incorporates those allegations herein by reference.

196.    Plaintiffs and Defendants had either a fiduciary or trust relationship.

197.    In addition, Section 3 of the Standstill Agreement entitled Plaintiffs to access to GCP's books and records and BBP is the successor entity to GGP.

653426-8

198.    GCP's and BBP's accounting is complex. At any given time, the entities have had a complicated web of relationship among a varying group of boxers, promoters, co-promoters, and/or managers.

199.    Plaintiffs need documents to understand the total revenues received by Cohen, GCP, and BBP over the last four years as well as how various funds from Plaintiffs were used. Without this information, Plaintiffs will be unable to know how Defendants misused their money and how many revenues were improperly kept, instead of shared as required by the parties' agreements and understandings, by Cohen, GCP and/or BBP.

### PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendants, as follows:

A.  Damages, including punitive damages, in an amount to be determined at trial;

B.  An accounting and an order of disgorgement;

C.  An award of costs; and

D.  Such other relief as the court deems just and equitable.

653426-8

Dated: August 25, 2023

Respectfully submitted,

KATSKY KORINS LLP

By: ___/s/Aytan Y. Bellin_____
    Aytan Y. Bellin
    605 Third Avenue
    New York, NY 10158
    Tel.: 212-716-3229
    Email: abellin@katskykorins.com

    Daniel R. Walfish
    *Pro hac vice application to be sought*
    Rachel Penski Fissell
    *Pro hac vice application to be sought*
    Katsky Korins LLP
    605 Third Avenue
    New York, NY 10158
    Tel.: 212-716-3390
    Email: dwalfish@katskykorins.com

    *Attorneys for Plaintiffs*

653426-8